IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| HENRY THIGPEN, *et al.,* | § | |
|    *Plaintiffs* | § | |
| | § | |
| v. | § | Cause No. 4:19-CV-2773 |
| | § | |
| GEO REENTRY, INC. | § | |
|    *Defendant* | § | |

## NOTICE OF REMOVAL TO FEDERAL COURT

TO THE HONORABLE DISTRICT COURT JUDGE:

NOW COMES GEO Reentry, Inc., a Defendant in the above styled and numbered cause, and files this Notice of Removal.  As grounds for removal, Defendant would show as follows:

1.      GEO Reentry, Inc. is a Defendant in a civil action pending in the 269th Judicial District Court, Harris County, Texas, styled HENRY THIGPEN, *et al.* v. GEO REENTRY, INC., Cause No. 2019-51349, which was filed in that court on July 26, 2019. The Plaintiffs allege the negligence of the Defendant caused them personal injuries and mental anguish. They have demanded damages in excess of the minimum amount necessary for diversity jurisdiction.

2.      Removal is proper because this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1). Plaintiffs are residents of Harris County in the State of Texas, and GEO Reentry, Inc. is a citizen of the State of Deleware, the state in which it is

incorporated, and of the State of Florida, in which it has its principle place of business. Accordingly, removal is proper under 28 U.S.C. § 1441(b).

3.     Pursuant to 28 U.S.C. § 1446(a), attached hereto are copies of all process, pleadings and the orders served upon Defendant in the state court proceeding. (Exhibit A).

4.     The action was commenced on July 26, 2019. Defendant filed an answer in the state court on July 27, 2019.

5.     This notice of removal is timely under 28 U.S.C. § 1446(b) because this notice of removal is filed less than thirty (30) days after Defendant first accepted service of a copy of a paper from which it could first ascertain that the case is one which is or has become removable. *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc*., 526 U.S. 344, 354, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999) (Removal deadline runs from date of service); *City of Clarksdale v. BellSouth Telecomms., Inc*., 428 F.3d 206, 210 (5th Cir. 2005) (same).

6.     The district courts of the United States have original jurisdiction over this action based on complete diversity of citizenship between the parties, in that every properly joined and served defendant is now, and was at the time the action was commenced, diverse in citizenship from every plaintiff. Plaintiffs are, and were at the time the suit was commenced, citizens of the State of Texas residing in Harris County, Texas. Defendants, GEO Reentry, Inc., and GEO Reentry Services, LLC are, and were at the time the suit was commenced, citizens of states other than the state of Texas with principle places of business in the State of Florida. Accordingly, none of the properly joined defendants is a

citizen of the State of Texas, and the parties are completely diverse. Plaintiff's petition, attached, asserts a claim against Defendant in excess of $75,000.00, exclusive of interest and costs; therefore, this Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

7.     Venue is proper in the United States District Court, Southern District of Texas, Houston Division, as the district and division embracing the place where the state action is pending. 28 U.S.C. §§ 1441(a), 1446(a).

8.     Pursuant to 28 U.S.C. § 1446(d), Defendant intends to serve written notice of this removal upon all interested and adverse parties and upon the Clerk of the Court for the 269th Judicial District Court of the State of Texas, Harris County, Texas, promptly after filing this Notice of Removal.

9.     Defendant GEO Reentry Services, LLC also answered in the state court and consents to this removal. There are no other defendants, *properly joined and served*, to join in or consent to the removal of the action. 28 U.S.C. § 1446(b)(2)(A).

WHEREFORE, PREMISES CONSIDERED, GEO Reentry, Inc., a Defendant in this action, pursuant to these statutes and in conformance with the requirements set forth in 28 U.S.C. § 1446, removes the case styled HENRY THIGPEN, *et al.* v. GEO REENTRY, INC., *et al.* Cause No. 2019-51349 from the 269th Judicial District Court, Harris County, Texas, to this Court on this 27th day of July, 2019.

Respectfully Submitted,


/s/ Timothy Flocos
Timothy Flocos
BRUKSTERN FLOCOS & ASSOCIATES,
LLP
611 West 14th Street, Suite 200
Austin, Texas 78701
(512) 467-6076
*tflocos@bfa-law.com*


/s/ Shawn Fitzpatrick
Shawn Fitzpatrick
FITZPATRICK & KOSANOVICH, P.C.
P.O. Box 831121
San Antonio, Texas 78283-1121
(210) 408-6793
*skf@fitzkoslaw.com*

Counsel for Defendant


## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument has been served on the following interested person(s) on July 27, 2019, via U.S. Mail:

Scott Arnold
The Law Office of Scott Arnold, PC
310 Main Street, Ste. 200
Houston, Texas 77002

Maverick Ray and Matthew Marzak
Maverick Ray and Associates, LLC
310 Main Street, Ste 300
Houston, Texas 77002

# Exhibit A

7/26/2019 1:57 PM
Marilyn Burgess - District Clerk Harris County
Envelope No. 35466651
By: Miaeda Hutchinson
Filed: 7/26/2019 1:57 PM

No._____

| | | |
|---|---|---|
| HENRY THIGPEN, *ET. AL.* | § | IN THE DISTRICT COURTY OF |
| Plaintiff | § | |
| | § | |
| VS. | § | HARRIS COUNTY, TEXAS |
| | § | |
| GEO REENTRY, INC.; GEO REENTRY | § | |
| SERVICES, LLC; MUNICIPAL | § | |
| CORRECTIONS FINANCE LP; | § | |
| CORNELL CORRECTIONS OF TEXAS, INC; | § | |
| CORNELL CORRECTIONS MANAGEMENT, | § | |
| LLC; and STEVEN BLANCHARD, Individually. | § | |
| Defendants | § | _____ JUDICIAL DISTRICT |

## PLAINTIFFS' ORIGINAL PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, HENRY THIGPEN, and the additional Plaintiffs listed in Paragraph I, below, hereinafter collectively called "Plaintiffs", complaining of GEO REENTRY, INC., and GEO REENTRY SERVICES, LLC, and MUNCIPAL CORRECTIONS FINANCE LP, and CORNELL CORRECTIONS OF TEXAS, INC., and CORNELL CORRECTIONS MANAGEMENT, LLC, and STEVEN BLANCHARD, and hereinafter sometimes collectively called "Defendants" and will show:

### I. PLAINTIFFS

The following Plaintiffs are individual residents of Harris County, Texas:

Adams, Charles; Allen, Johnelle; Anderson, Alan Dale; Anderson, Lloyd Edward; Apolinar, Rogelio; Ardrey, Robert; Arlington, Pitte; Arriaga, Raymond; Bagby, Cedric W; Bardo II, Charles F; Beaver, Morris D; Bellotte, Ernest; Blackshear, Weldon; Block, Thomas H; Borrego, Tony; Bowie, Douglas N; Boyd, Davis L; Brady, Reginald; Branch, Jesse Jr.; Brimsey, John; Bui, Hoai; Burton, Harry Robert; Burns, Sammie; Caldwell, Ronald; Campos, Juan; Cantwell,

1

Lee; Carr, Eric W; Carraway, Deforiest; Casey, Zimman; Coke, Anthony; Coleman, Lawrence;

Crawford, Everett; Criss, Craig Anthony; Cross, Kendrick; Daniel, Lonnie; Daniel, Richard;

Davis, Donald; Davis, Phillip; Davis, Richard; Delgado, Benjamin; Dent, Johnnie; Doyle,

Joseph; Drewry, Horace N; Dykes, James; Durden, Leo II; Durden, Ronald; DuRousseau, Clyde;

Equia, Hipolito; Everage, Bradley; Everitt, Randy; Falcone, David Daniel; Farmer, Louis Oliver;

Fondren, Michael; Galentine, Dwain; Gann, Gordon; Garcia, Dominic R; Garcia, Gabriel;

Garcia, Rudolph; Garrett, Eddie R; Garrick, Byron Christopher; Garza, Julian; Gee, Wilson;

Gentry, Arnold; George, Freddie A; Gilbert, Marion Anthony; Gilpin, Dwayne; Goleman,

Lawrence; Gomez, Michael L; Gonzales, Albert Ramirez; Gonzalez, David; Gonzales, Ronnie;

Goodeau, Anthony; Green, Noble L; Griffin, James; Grines, Daniel E; Hair, James; Hammers,

Gregory; Harris, Michael M; Hawkins, David L; Hayes, Reginald; Henderson, Chester;

Henderson, Gregory; Henry, James; Higgins, George; Hinojosa, Cruz Joaquin; Hodges, Kenneth;

Holland, Jordan; House, Gregory D; Hull, Erik; Jackson, Luckes; Jackson, Patrick D; Jimmy,

Stewart; Johnson, Anthony A; Johnson, Sean; Jones, Issac R; Jones, Kevin; Joseph, Manuel;

Keith, Roger Dale; Kendrick, Daniel; Kindelan, Alcides; King, Steven; Kittrell, Quillis;

Lacefield, Curtis; Laird, Don Melton; Larsen, Brett; Laundry, David; Lawson, Jonathon; Lavan,

Eugene; Lazaro, Perez; Ledesma, Jesse J; Lee, Bobby; Lee, Gentry A; Johnson, Anthony; Lowe,

Ricky; Lozano, Jesse; Luna, Joe; Maddoux, James; Martin, David L; Martinez, Jesus Jesse;

Martinez, Sergio; Martinez, Steven; McBurnett, Fred; McCarty, Randy A; McClure, Joseph;

McCullough, Samuel; McDowell, Derrell Wayne; McWilliams, Randy Edwards; McPowell,

Derrell; Mena, Diego; Mike, Donald R; Miller, Gerald Lynn; Miller, Willie; Milligan, Mark;

Millines, Wilbert J Jr.; Montgomery, Billy; Morris, Joseph; Mortensen, Bruce H; Moya,

Michael; Murry, Richard; Myers, Herbert L; Nealy, Joseph; Nealy, Timothy; Newman, Richard;

Newton, Mark E; Noratmacfie, Arnold; Norris, Alphonse; Olinger, Jeremy Sean; Parker, Arnold R; Patterson, Charles; Payne, Joseph; Penny, Mark Bradley; Pena, Roberto; Perez, Lazaro; Phelps, Trevor; Pickett, Christopher L; Pittie, Arlington; Pleasant, Barry; Poehls, Ricky; Poutler, Michael; Price, Devin; Rash, Lenny; Ray, Ricky; Reece, Thomas; Reynolds, Thomas; Roberson, James A; Robinson, Alonzo; Rodriguez, Alberto; Rodriguez, Daniel; Rodriguez, Luis; Rodriguez, Raymond; Rosa, Clifford; Ross, Steven S., Sanchez, Mario; Sandoval, Ernesto; Sanders, Joseph; Sellers, Michael Lee; Shelby, Thomas E; Sherman, Taylor; Shinkewicz, Michael James; Smith, Lewis; Soloman, Daniel; Sotomayor, Rafael; Spelman, Tommy; Spence, Charles E; Stewart, Damion T; Stewart, Jimmy L; Taylor, Sherman R; Thigpen, Henry; Thomason, Michael; Thompson, Russell; Thurman, Randall; Turk, Howard Edward; Turner, Edgar; Urbina, Roger; Vasquez, Ricardo; Walker, Carl Edwards; Walker, David O; Weller, Gunther; White, Leonard Jr.; Whittenburg, John C; Williams, Aaron Jerome; Williams, Billy R; Williams, Erving; Williams, Jeremy; Williams, Johnny R; Wilson, Loren M; Woods, Kenneth W; Wright, Darrell T.

## II. DEFENDANTS

Defendant GEO Reentry, Inc. and dba GEO Reentry Services and dba GEO Reentry Services, Inc. and dba Southeast Texas Transitional Center and dba Cornell Corrections of Texas, Inc. and dba Cornell Corrections Management, LLC is a foreign entity doing business in Texas and may be served on its registered agent Corporate Creations Network Inc., 2425 W Loop South #200, Houston, TX 77027.

Defendant GEO Reentry Services, LLC and dba GEO Reentry Services and dba GEO Reentry Services, Inc. and dba Southeast Texas Transitional Center and dba Cornell Corrections of Texas, Inc. and dba Cornell Corrections Management, LLC is a foreign entity doing business

in Texas and may be served on its registered agent Corporate Creations Network Inc., 2425 W Loop South #200, Houston, TX 77027.

Defendant Municipal Corrections Finance LP dba Southeast Texas Transitional Center is a foreign entity doing business in Texas and may be served on its registered agent Corporate Creations Network Inc., 2425 W Loop South #200, Houston, TX 77027.

Defendant Cornell Corrections of Texas, Inc. dba GEO Reentry, Inc. and dba GEO Reentry Services and dba GEO Reentry Services, Inc. and dba Southeast Texas Transitional Center and dba Cornell Corrections Management, LLC is a Texas based LLC and may be served on its registered agent at 1700 West Loop South, Suite 1500, Houston, TX, 77027.

Defendant Cornell Corrections Management, LLC dba GEO Reentry, Inc. and dba GEO Reentry Services and dba GEO Reentry Services, Inc. and dba Southeast Texas Transitional Center and dba Cornell Corrections of Texas, Inc. is a foreign entity doing business in Texas and may be served on its registered agent at 621 N.W. 53 Street, Suite 700, Boca Raton, FL, 33487.

Defendant Steven Blanchard is an individual resident of Harris County, Texas, and may be served at his office at 10950 Beaumont Highway, Houston, Texas, 77078.

### III. JURISDICTION/VENUE

This Court has jurisdiction over this matter. Venue properly lies in Harris County, Texas, the County in which the injuries occurred and Plaintiffs' cause of action accrued and where one or more of the Defendants reside.

### IV. FACTS

On or about August 24, 2017, and in the days prior thereto, Plaintiffs were residents at the Southeast Texas Transitional Center ("STTC"), a facility run by GEO Reentry Services, and the other corporate Defendants listed herein. These corporate Defendants are sometimes

4

hereinafter collectively called "GEO".  GEO is a large national company that owns and/ or operates a huge chain of private prisons, as well as halfway houses for parolees.  Defendant Municipal Corrections Finance LP owns the land and buildings at the aforementioned facility, STTC. Defendant Steven Blanchard is the Senior Facility Director of STTC. Defendant Steven Blanchard is responsible for all policy, staff, and every aspect of the daily administration and operation of the STTC.  The STTC is contracted to the State of Texas to provide housing, supervision and, care to Plaintiffs.   Defendants had contracted with the Texas Department of Criminal Justice ("TDCJ") therefore, but by statute do not enjoy sovereign immunity. Plaintiffs had fully completed their prison terms, had repaid their debt to society, and were earnestly attempting to find jobs and reenter society as productive members. Defendants were charged with helping them do that—but completely and utterly failed them during Hurricane Harvey. Despite accurate weather forecasting, warnings by governmental entities, and amid massive preparations by other citizens of Harris County and surrounding areas for the impending, virtually certain, massive assault of Hurricane Harvey, the Defendants abandoned nearly 500 residents of said STTC located at 10950 Beaumont Hwy., Houston, Texas 77078 , to fend for themselves, without food, clean water, medical care or needed prescription drugs, supervision, security, or any other minimally sufficient preparations.  The Plaintiffs were trapped in the flooded facility, with few or no agents or employees of Defendants (which had previously fled). The STTC facility is located between a landfill and a hazardous waste processing and cleaning facility, all of which flooded and subjected Plaintiffs of up to waist-high water filled with the filth and toxins from the surrounding landfill and toxic waste facility. Plaintiffs were precluded from leaving the premises because it would be a violation of their parole, and they were advised by the Texas Department of Corrections and by Defendants, that if they did leave they would be

subject to a "blue warrant", potentially sending them back to prison. Defendants were thus presented with a Hobson's choice of either remaining on the premises in its flooded condition, with no food, water, medicine, security and other severe health challenging conditions, as versus leaving the facility and thereby risking their freedom and return to prison for a parole violation. Plaintiffs were nearly starved, were dehydrated and incurred rashes, infections and other injuries from the toxic flood waters. Many residents had preexisting mental and physical disabilities and medical conditions that required medication and medical monitoring –none of which was available, and which caused severe mental and physical distress. All security monitors left their posts, and the front gate was left wide open, subjecting the Plaintiffs and others to potential personal security risks.

On late Tuesday night, August 29th, 2017, after four days of barbaric conditions, after the flood waters had subsided, the Texas Department of Criminal Justice sent buses and loaded the residents, at gunpoint, and took them to various TDCJ facilities. They were forced to abandon all their personal possessions, most of which were irretrievably lost. They suffered further indignities, humiliation and health challenging conditions thereafter, but these outrages were committed by the sovereign immunity protected TDCJ personnel and system.

## V. NEGLIGENCE

Defendants were negligent, and violated the standard of the reasonable transitional center owner and operator due to the actions and omissions of their agents and employees acting in the course and scope of their employment.

Defendants also have direct negligence as set out below for failure to have in place policies and procedures to prevent these types of occurrences; failing to have sufficient fellow workers and failing to properly supervise their agents and employees in the course of their duties.

6

These are acts of direct negligence; the "premises" tort law factors do not apply, thus lessening the burden on the Plaintiff.

The following acts and omissions proximately caused the harm to Plaintiffs:

1. Failure to adequately feed,

2. Failure to supply clean water for bathing and/or drinking,

3. Failure to provide security monitors; failure to protect residents from potential resident-on-resident crime,

4. Failure to safeguard personal belongings of residents,

5. Failure to provide medical treatment, including, but not limited to that for the mentally ill, handicapped, diabetic, and to provide other needed medications and to treat the conditions of skin rashes, cuts, infections and dehydration caused by the flooding,

6. Failure to implement the Hurricane Plan, as promised in the official policy handbook,

7. Failure to take reasonable steps to avoid residents breaching parole; by trapping them inside, without adequate food or water, and in knee to waist high water with the security gates open, under threat of "blue warrant" revocation of parole, if they left the premises; which gave residents a "Hobson choice" of surviving or going back to prison,

8. Failure to safeguard residents from exposure to chemicals/toxins from the adjoining landfill and/or from the immediately adjoining hazardous material storage, transportation and cleaning companies,

9. Failure to evacuate, with knowledge of previous flooding and the virtual certainty of flooding during Harvey, and

10. Failure to safeguard public by manning security gate or securing perimeter.

## VI. STEVEN BLANCHARD NEGLIGENCE

Defendant Steven Blanchard was negligent, and violated the standard of the reasonable transitional center operator due to his actions and the actions and omissions of STTC's agents and employees acting in the course and scope of their employment.

Defendant Steven Blanchard also has direct negligence for failure to have in place policies and procedures to prevent these types of occurrences; failing to have sufficient fellow workers and failing to properly supervise their agents and employees in the course of their duties.

Plaintiffs incorporate all the allegations of negligence set out in the previous Paragraph V as applicable to the said individual Defendant as it fully set out.

## VII. PREMISES CLAIM

In the alternative, Defendants' conduct, and that of its agents, servants, and employees, acting within the scope of their employment, constituted a breach of the duty of ordinary care owed by Defendants to Plaintiffs.  Defendant knew or should have known that a condition on the premises created an unreasonable risk of harm to invitees in that Defendants knew or should have known of the likelihood of an injury such as Plaintiffs suffered, to warn thereof and of the other acts of negligence set out in Paragraph V, above.  Defendants knew or should have known that its conditions on its premises created an unreasonable risk of harm to invitees because Defendants created, allowed and/or failed to prevent said conditions.  Defendants knew these conditions caused an unreasonable risk of harm to invitees such as the Plaintiffs, who had to live in said environment.  Defendants failed to exercise ordinary care to reduce or eliminate this risk, or to warn invitees regarding the above dangers.  Each of these acts and omissions, whether taken singularly or in any combination, were a proximate cause of Plaintiffs' injuries and

damages as described below.

### VIII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

In the alterative, Defendants' conduct, and that of their agents, servants and employees, while acting within the scope of their employment, was intentional and/or reckless, constituting both extreme and outrageous conduct, which is the proximate cause of Plaintiffs' severe emotional distress. Defendants' intentional and/or reckless conduct resulted in Plaintiffs being trapped at the Southeast Texas Transitional Center during Hurricane Harvey and the subsequent flooding of same for at least four days. During the duration of Plaintiffs four-day ordeal, and beyond, Plaintiffs suffered and/or still suffer from severe emotional distress.

### IX. PUNITIVE DAMAGES

The acts and omissions enumerated above, by a clear and convincing evidence standard, caused the harm to Plaintiffs and resulted from gross negligence attributable to the Defendants.

When viewed objectively from the standpoint of Defendants at the time of its occurrence, their above acts and omissions involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others; and Defendant had actual, subjective awareness of the risks involved, but nevertheless preceded with conscious indifference to the rights, safety, or welfare of others.

Further, Defendants authorized the doing and the manner of said acts and omissions, or their agents or employees were unfit and Defendants were reckless in employing them, or their culpable agents or employees were employed in a managerial capacity and were acting in the scope of employment, or Defendants and/or a vice-principal and/or a manager of Defendants ratified or approved the said acts and omissions.

As a result of said gross negligence, Plaintiffs are entitled punitive damages allowed by

law.

## X. DAMAGES TO THE PLAINTIFFS

Plaintiffs will respectfully request the Court and Jury to determine the amount of loss Plaintiffs have incurred and will incur in the future not only from a financial standpoint but also in terms of good health and freedom from pain and worry. There are certain elements of damages provided by law that Plaintiffs are entitled to have the jury in this case consider separately to determine the sum of money for each element that will fairly and reasonably compensate Plaintiffs for the injuries, damages and losses incurred from the date of the accident in question until the time of trial of this case. Those elements of damages are as follows:

1. The physical pain that the Plaintiffs have suffered from the date of the occurrence in question up to the time of trial, and will in reasonable probability suffer in the future;

2. The mental anguish that the Plaintiffs have suffered from the date of the occurrence in question up to the time of trial and will in reasonable probability suffer in the future;

3. The amount of reasonable medical expenses necessarily incurred in the treatment of Plaintiffs' injuries from the date of the accident in question up to the time of trial and will in reasonable probability suffer in the future;

4. The loss and/or reduction of earnings and/or earning capacity sustained by Plaintiffs from the date of the occurrence in question up to the time of trial and will in reasonable probability suffer in the future;

5. The physical impairment which Plaintiffs have suffered from the date of the occurrence in question up to the time of trial and will in reasonable probability suffer in the future;

6. Disfigurement of Plaintiffs' bodies up to the time of trial and that they will in reasonable probability suffer in the future;

7. For the loss of Plaintiffs' personal property, Plaintiffs claim the replacement and/or actual/intrinsic value damages, in addition to sentimental value damages, which is the reasonable special value to each Plaintiff.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that upon final hearing hereof, Plaintiffs recover judgment against Defendants, jointly and severally, for their fair and just damages to which they are entitled, plus punitive damages, together with costs, pre-judgment and post-judgment interest and such other and further relief to which Plaintiffs may be justly entitled, at law or in equity.

Respectfully submitted,

LAW OFFICES OF SCOTT ARNOLD, P.C.

Scott Arnold, P.C.
310 Main, Suite 200
Houston, Texas 77002
Tel: (713) 227-6653
Fax: (713) 227-6654
State Bar No. 01345470
Email: scott@scottarnoldpc.com
ATTORNEY FOR PLAINTIFFS

LAW OFFICES OF MAVERICK RAY

Maverick Ray
State Bar No. 24080451
Matthew M. Marzak
State Bar No. 24098048
310 Main, Suite 300
Houston, Texas 77002
Tel: (281) 947-2007
Fax: (713) 714-2225
Email: maverickraylaw@gmail.com
ATTORNEY FOR PLAINTIFFS

Cause No. 2019-51349

| | | |
|---|---|---|
| HENRY THIGPEN, ET. AL. | § | IN THE DISTRICT COURT |
| | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | HARRIS COUNTY, TEXAS |
| v. | § | |
| | § | |
| GEO REENTRY, INC.; GEO | § | |
| REENTRY SERVICES, LLC; | § | |
| MUNICIPAL CORRECTIONS FINANCE | § | |
| LP; CORNELL CORRECTIONS OF | § | |
| TEXAS, INC.; CORNELL CORRECTION | § | |
| MANAGEMENT, LLC; and STEVEN | § | |
| BLANCHARD, Individually | § | |
| *Defendants.* | § | 269TH JUDICIAL DISTRICT |

## ORIGINAL ANSWER BY DEFENDANTS
## GEO REENTRY, INC. AND GEO REENTRY SERVICES, LLC.

TO THE HONORABLE JUDGE OF SAID COURT:

NOW COME Defendants GEO REENTRY, INC., and GEO REENTRY

SERVICES, LLC. ("Defendants") through their attorneys and file this Original Answer.

Defendants would show the following:

### I.    GENERAL DENIAL

Pursuant to TEX. R. CIV. P. 92, and for the express purpose of requiring Plaintiffs

to meet their burden of proof, Defendants deny each and every allegation contained

in Plaintiffs' Original Petition, except those expressly admitted herein.

### II.    NATURE OF THE CLAIMS

1. Plaintiffs are Texas felons, conditionally released from prison and permitted to

    serve the remainder of their sentences under the supervision and custody of the

    Texas Department of Criminal Justice - Parole Division ("TDCJ-PD"). *See* TEX.

GOV'T CODE § 508.001(5) and (6). The TDCJ-PD "supervise[s] and reintegrate[s] felons into society after release from confinement." TEX. GOV'T CODE § 493.005.

2. Pursuant to that authority, the TDCJ-PD did not find Plaintiffs suitable for release into the Harris County general public, but instead placed them in the Southeast Texas Transition Center ("STTC"), a Houston area halfway house operated by Defendants. Plaintiffs released to the STTC were required to remain on the facility grounds unless the TDCJ-PD specifically approved any proposed trip into the community.

3. The STTC facility was formerly a bible college: it consists of six primary buildings including an administration building, a kitchen and mess hall, and four dorms. Three of the dorms are two-story, while one is one-story.

4. The STTC dorms hold nearly five hundred beds, arranged bunk-bed style, and house only male parolees. The TDCJ-PD pays for the room and board parolees are provided at the STTC from taxpayer funds.

5. The STTC is not a medical provider, and does not prescribe or provide medications. The facility stores the parolees' medications in a secure medication room to help prevent medication theft and abuse. Parolees come to the medication room to self-administer their medications under supervision.

6. The STTC is not a prison or jail; if parolees placed there choose to leave without permission, the STTC has no authority to stop them. Instead, the STTC reports all absconders to the TDCJ-PD, which has the authority to take appropriate action, including revoking their parole and returning them to prison.

7. Plaintiffs claim they suffered damages when Hurricane Harvey flooding affected

the STTC from August 27 to August 29, 2017. The administrative building, mess hall, and the three two-story resident dorms experienced flooding on their first floors that peaked at about 16" to 18" – which is below the height of the bottom bunks.

8.  Affected parolees and their bedding were temporarily moved to the second floor of their dorms, and the facility staff stayed on-site around the clock to mitigate the flooding, to maintain essential functions like the kitchen and the medication room, and to conduct rounds, roll calls, and counts until TDCJ-PD evacuated Plaintiffs to other facilities.

9.  Plaintiffs no doubt experienced inconveniences during Hurricane Harvey flooding, just like the STTC staff and nearly every resident of Harris County and southeast Texas. Like nearly all of Houston, the flooding made Plaintiffs' normal routines impossible. But the flooding at the STTC was minimal, never reaching over calf height, and the TDCJ-PD relocated Plaintiffs less than three days after the floods began.

10.  Unlike many Harris County residents, Plaintiffs at all times were provided essentials like food, water, a dry place to sleep, and access to their medicines over the roughly 48-72 hours from when the water began to rise until they were transported to other facilities by the TDCJ-PD.

11.  Plaintiffs complain that their usual hot meals were not provided for each meal during this time, that after the mess hall flooded they had to eat cold sandwiches and other prepared foods, and that these brown-bag meals were brought to their dorms at different times than the usual mess hall meal times.

12.  Plaintiffs also appear to blame the STTC for "failure to take reasonable steps to

avoid residents breaching parole," by leaving the facility without TDCJ-PD permission – in other words, they allege that the STTC should have stopped the Plaintiffs from their own choice to walk away from the facility. The Plaintiffs were each responsible for their own decisions to follow or break the TDCJ-PD rules governing their release, and must accept that responsibility.

13. Similarly, despite the fact the STTC is not a prison or jail, Plaintiffs blame the Defendants for a "failure to safeguard the public by manning security gates or securing the perimeter," – in other words, failing to protect the public from Plaintiffs by forcibly keeping them in the facility. The STTC may only house but does not have the authority to imprison the Plaintiffs – only TDCJ-PD has that authority.

14. Plaintiffs remaining complaints are at worst that some personal property was damaged by water, or that walking in the calf-high water on the STTC grounds led to minor rashes or irritation for a few days afterwards. Defendants note that all STTC staff worked in the same conditions, and not one of them experienced more than minor irritation or required any medical care.

## III.    SPECIFIC FACTS AND DENIALS

15. STTC staff was fully present at the facility during Hurricane Harvey, and lived through the exact same conditions as the Plaintiffs, while diligently carrying out their duties to ensure the Plaintiffs were cared for – including ensuring that they were fed, had clean water, and had access to their medication amongst other things.

16. The STTC staff on-site included an assistant facility director, two lieutenants, a

shift supervisor, a food service supervisor, and other staff for a total that exceeded the number of staff usually present. They were supported by an off-site emergency response team that coordinated efforts with TDCJ-PD and others to manage the response to Hurricane Harvey.

17. STTC staff worked around the clock, sleeping on makeshift cots in flooded administration buildings when they got a chance to rest, and living under the same conditions as Plaintiffs, as in fact most of Houston, experienced.

18. STTC staff remained diligent and on-duty even while flooding from Hurricane Harvey threatened and affected their own homes and families. Like so many in Houston and throughout southeast Texas, some STTC staff lost their homes, their cars and other possessions, and their families were displaced to temporary shelters. Some have yet to fully recover more than a year later.

19. Defendants will show that the STTC staff met Hurricane Harvey with the same determination, good will, and resilience exhibited by the vast majority of the citizens of Houston, Harris County, and southeast Texas, and displayed commendable dedication and professionalism during this disaster.

20. The allegation that STTC staff "abandoned" Plaintiffs at the facility is false, baseless, and inconsistent with the Plaintiffs' own statements.

21. Defendants note that about one-third of the Plaintiffs bringing this action were housed in Building 6, a one-story building situated on the highest part of the STTC grounds. That building did not flood, never lost power, lights, or air conditioning, and was staffed the entire duration of Hurricane Harvey and the resultant floods.

### A.  Background - Plaintiffs' Placement at the STTC by TDCJ-PD

22. The STTC halfway house facility was originally built as a campus for a bible
college. It contains six buildings including dormitories, classrooms, and dining
areas, spread over grounds of approximately nine acres in Houston. It is capable
of housing up to 500 or so residents.

23. The TDCJ-PD places certain prisoners released under its supervision and
custody, like Plaintiffs, in halfway house programs as a condition of their
release. TEX. GOV'T CODE. § 508.119.

24. Those prisoners TDCJ-PD places at a halfway house are required, amongst
other things, to remain on the facility grounds except as permitted by their
TDCJ-PD parole officer or supervisor.

25. Over and above this requirement, approximately one-third of the STTC
residents were supervised by TDCJ-PD under the Super-Intensive Supervision
Program ("SISP"). SISP is the highest level of supervision provided by the
TDCJ-PD for potentially dangerous offenders.  All offenders on SISP are
monitored with Global Positioning System (GPS) technology and are required
to comply with 24 hour-a-day schedules, which must be pre-approved in writing
by their Parole Officer.

26. In addition, about half of the STTC residents were sex offenders supervised by
TDCJ-PD under heightened conditions intended to prevent them from re-
offending while in the Houston community.

27. The STTC management and staff is both male and female, however for safety
and security reasons the STTC only accepts male parolees.

28. The STTC facility grounds are entirely out of the 100-year floodplain, and only a

small portion are within the 500-year floodplain. The facility had no history of significant flooding, even in prior hurricanes.

### B.  Preparations for Hurricane Harvey by TDCJ-PD and the STTC

29. TDCJ-PD requires the STTC to submit an updated Hurricane Emergency Plan ("Plan") every year for agency approval. The 2017 Plan was approved approximately three months before Hurricane Harvey, and provides that the decision to evacuate any part of the facility will be made solely by the TDCJ-PD. The STTC Facility Director may make a decision to evacuate, but only upon determination that circumstances exist which in her opinion create the possibility of loss of life or injury to residents or staff.

30. The Plan specified that any potential evacuation would be conducted by the TDCJ-PD using its resources for transportation, security, and relocation. Because Plaintiffs remained in state custody, TDCJ-PD had authority to supervise and manage Plaintiffs under the circumstances while also considering the protection of the general public.

31. As Hurricane Harvey developed, the STTC and the TDCJ-PD monitored the NOAA Tropical Prediction Center 5-Day Projection of the storm and put their response teams on standby when the projection included Houston. The facility inventoried its stores of emergency supplies and equipment, and added to them as prudent.

32. The STTC planned to "weather in place" in accordance with the orders of TDCJ-PD, the recommendations of the City of Houston, Harris County, and every other civil authority at the time of Hurricane Harvey, based on an anticipated

widespread rainfall amounts of 10-15".



33. Pursuant to the Plan, TDCJ-PD and the Defendants each set up Emergency Command Posts that were active and in full communication with each other, as well as with regional authorities, prior to the arrival of Hurricane Harvey.

34. The STTC, in accordance with the Plan, was prepared with emergency supplies and equipment including more than: three days of bottled water for all parolees and staff; three days of food supplies for all parolees and staff; stocked First Aid Kits; emergency generators and fuel stocks; and emergency lighting, as well as many other supplies.

35. In particular, the STTC added extra supplies to its emergency stores in the week prior to Hurricane Harvey, including delivery of over *3500 bottles* of bottled water, and nearly *twenty-two thousand (22,000) pounds* of food deliveries.

36. On August 24, the STTC was locked down, and the parolees were informed that movement off the grounds was cancelled until the hurricane passed.

## C.  Hurricane Harvey Events and Timeline

37. Hurricane Harvey produced an historically unprecedented rainfall of nearly 45 inches over the four days from August 26 through August 29, 2017. Not only were these rainfall amounts far in excess of what had been forecast, they covered a far greater area as well. Hurricane Harvey delivered the broadest and most intense rainfall ever recorded anywhere in the United States since reliable historical records began.

38. One day into the rain, the National Weather Service called it "unprecedented," and warned the impacts were "unknown," and "beyond anything experienced."



39. On the morning of August 27, as a result of the historic record rainfall, floodwaters rose with unprecedented speed and scope throughout Houston. All major highways became impassable, and surface streets were navigable by boat only. Official Houston Transtar maps showed road closures that covered the

entire city:



40. The result was that by the time the water rose, it was impossible to evacuate from the Houston area due to the flooded highways.

41. For example, Ben Taub Hospital, Houston's largest level 1 trauma center, originally intended to shelter in place per the recommendations of Houston and Harris County officials. When the hospital, in light of the rising waters, began patient evacuation on August 27, it had to abort its plan because neither outgoing nor incoming ambulances could get through flooded streets around the hospital complex.

42. The Hurricane Harvey rains were so intense that by the morning of August 28, the National Weather Service had to update its map colors, as the old map key did not include colors for the rain levels Houston was experiencing:



43. The speed of the rising floodwaters prompted thousands of calls to 911, but left Houston first responders only able to respond to life-threatening emergencies. Houston Police conducted over 2,000 rescue missions as residents were forced to their rooftops by floodwaters.

44. Hurricane Harvey produced the largest and most devastating structural flooding event ever recorded in Harris County. More than 150,000 homes were flooded, and over 300,000 homes lost power, forcing between 30,000 and 40,000 Harris County residents to seek housing in temporary shelters. At least another 30,000 were displaced throughout southeast Texas.

45. The Harris County Flood Control District estimates that of the 154,170 flooded homes, over two-thirds were outside the 100-year floodplain and nearly half were outside both the 100-year and 500-year floodplains.

### D. Events at the STTC, and actions by the TDCJ-PD

46. At about 11pm on August 26, STTC noted that Houston roadways were beginning to flood, although not around the facility. In case further flooding

impacted staff shift changes, the STTC on-site staff remained in place. Over the next three days, some off-duty staff would find ways to get through flooded roads to the STTC and help their coworkers do their jobs. The STTC never had less than a full staff.

47. On the afternoon of August 27, some pooling water seeped into STTC Building 4, a 34-bunk dorm. A small amount got into two resident rooms but was cleaned up with a shop-vac and caused no damage. Sandbags were placed by the outside door, and the water receded during a break in the rain.

48. As of about 11pm on August 27, the TDCJ-PD informed the STTC that the Houston Fire Department was considering bringing evacuated sex offenders to the STTC, as they could not be brought to shelter facilities due to their sex offender status. Noting that Houston first responders apparently considered the STTC safe to shelter evacuees, the facility nonetheless advised they were at capacity and could not accept them.

49. At about 4:40am on August 28, the STTC reported standing water in Building 1, the administration building containing the control area and the medication storage room. STTC staff were able to continue working at their posts despite the water, and the control room and the medication room operated normally. Sandbags appeared to control the water, and staff monitored the issue.

50. Later in the morning on August 28, water reached the ground floor of three of the dorms – Buildings 3, 4, and 5. Over the next 24 hours the water level gradually rose to about a foot to eighteen inches high in the worst places, but never reached the level of the bottom bunks and bedding in any dorm. STTC staff reported this to the TDCJ-PD, and moved Plaintiffs to the second floor of

their dorms or to buildings that did not flood. Building 3 and 5 are below:

 

51. Once the rising water reached STTC housing on August 28 and the scope of the flooding became apparent, TDCJ-PD began efforts to relocate Plaintiffs to another facility. Over the next roughly 36 hours, TDCJ-PD bus convoys would make three separate attempts to reach the STTC, but had to turn back twice due to impassable road flooding.

52. Only TDCJ-PD could authorize the evacuation of the facility under the circumstances, or could provide the transportation or alternative housing required. In fact, since roughly half of the Plaintiffs were registered sex offenders, they would not have been admitted to emergency shelters and thus required special relocation facilities.

53. The STTC staff therefore worked to keep essential operations going in spite of the flooding. Staff ran the kitchen and fed the parolees hot meals as long as possible, and then prepared and distributed brown-bag meals. Parolees ate at

least twice a day, and had ample clean water.

54. Power had to be cut off to dorms in Buildings 3, 4, and 5 when the water rose near the level of the lowest wall AC outlets. Staff used generators to power limited equipment in Buildings 1 and 2 to maintain control, medication distribution, and kitchen functions.

55. When the STTC medication distribution room flooded, staff relocated the medicines to the facility control room where they centralized operations, and distributed medications to the parolees from that location rather than the usual "pill window."

56. STTC staff made rounds and conducted counts of each dorm building regularly, and distributed food and bottled water when the flooding prevented feeding at the mess hall.

57. On August 28, high water forced the first two TDCJ-PD evacuation efforts to turn back, after getting so close on one attempt that TDCJ-PD ordered the STTC to marshal the parolees outside for loading onto the buses. When the buses did not arrive, the STTC staff continued to maintain facility operations, including food, water and medicine distribution.

58. The TDCJ-PD bus convoy successfully reached the STTC a little after 7pm on August 29.

59. By this time, the water had greatly receded, and many parolees were reluctant to leave the facility for relocation to more restrictive TDCJ locations. TDCJ-PD officers had to display weapons to maintain order and get the parolees onto the evacuation buses.

60. STTC staff had already prepared bus rosters as directed by the TDCJ-PD, and

turned over medications for each resident to the TDCJ-PD officials in accordance with those rosters to ensure each resident was accompanied by their medications.

61. The TDCJ-PD staff of parole and other officers conducted the evacuation, and the buses were fully loaded by about 11:30pm. The buses then departed and the STTC evacuation was complete.

## AFFIRMATIVE AND OTHER DEFENSES

62. The STTC flooding took place due to a once in 5000-year rain event – that is, rainfall of this magnitude is estimated to occur only once every 5000 years. No premises liability claim is possible, as this level of rain event was not foreseeable, nor was planning for it reasonable.

63. The STTC acted as a government contractor, and had no discretion to release the Plaintiffs from the conditions of their supervision by TDCJ-PD at the facility. Defendants claim both good-faith immunity and immunity as a government contractor.

64. Defendants deny that their actions were negligent, and assert that the flooding resulting from Hurricane Harvey was an act of God, and was inherently unforeseeable. Defendants acted at all times reasonably under these circumstances, and their actions were not the cause or proximate cause of any damages alleged by Plaintiffs.

65. Plaintiffs have no contract with Defendants; the cost of their placement at the STTC program is borne by TDCJ-PD. Though Plaintiffs are required to seek employment, and compensate the TDCJ-PD for the costs of their placement,

they have not done so.

66. Plaintiffs have no third-party contract claim. The rights that are granted in a particular contract to third parties are up to the parties to the contract to decide. See generally *MCI Telecomm. Corp. v. Tex. Utils. Elec. Co*., 995 S.W.2d 647, 651 (Tex.1999) ("In determining whether a third party can enforce a contract, the intention of the contracting parties is controlling."). The parties are free to give third parties rights or not give them rights. See *id*. The parties are specifically free to determine whether a third party is vested with authority to sue for enforcement of the contract. See *EPGT Tex. Pipeline, L.P. v. Harris County Flood Control Dist*., 176 S.W.3d 330, 340 (Tex.App.-Houston [1st Dist.] 2004, pet. dism'd). An express disclaimer is not necessary to deny third party rights; instead, an express obligation is necessary to confer them. See *Union Pac. R.R. Co. v. Novus Int'l, Inc*., 113 S.W.3d 418, 422-23 (Tex.App.-Houston [1st Dist.] 2003, pet. denied) (concluding that the contract did not clearly spell out an intent on behalf of the contracting parties to confer a direct benefit to a third party).

67. Defendants assert proportionate responsibility and the right to designate other parties who are responsible for any damages Plaintiffs allege or prove. Defendants request the jury to compare the extent to which Plaintiffs and any other persons or parties, whether joined in this suit or not, may have caused or contributed to cause any damages complained of by Plaintiffs.

68. Defendants deny that any Plaintiff is entitled to any damages of any type, but in the alternative plead any and all limitations and caps on damages that may apply to this cause of action. This assertion and pleading includes, but is not

limited to, any and all caps, bars and limitations set forth under TEX. CIV. PRAC. & REM. CODE §32.001-§32.003, §33.001-§33.004, §33.011-§33.017, §41.001-§41.013, §74.301-§74.303, §74.501-§74.507.

69. Defendants deny that any Plaintiff is entitled to future damages. However, to the extent that any Plaintiff may recover future damages, Defendants assert that any such damages must be reduced to present value.

## PRAYER

Defendants pray that all claims against them be dismissed; that Plaintiffs take nothing, that Defendants be awarded all attorney's fees and costs, and for such other and further relief to which they may be justly entitled.

Respectfully submitted,

By: /s/ Tim Flocos
Tim Flocos, TX Bar No. 24033697
TIM FLOCOS ATTORNEY AT LAW
1411 West Ave., Suite 200
Austin, Texas 78701
Telephone:   512.467.6076
*tim@timflocos.com*

_____/s/_____
Shawn Fitzpatrick, TX Bar No. 00787474
FITZPATRICK & KOSANOVICH, P.C.
P.O. Box 831121
San Antonio, Texas 78283-1121
(210) 408-6793
*skf@fitzkoslaw.com*

**Attorneys for Defendants**

## NOTICE OF ELECTRONIC FILING

I, **TIM FLOCOS**, do hereby certify that I have electronically submitted for filing a correct copy of the foregoing document in accordance with the Electronic Case Files system on this the 27th day of July, 2019.

*/s/ Tim Flocos*
**TIM FLOCOS**


## CERTIFICATE OF SERVICE

I, **TIM FLOCOS,** do hereby certify that a true and correct copy of the foregoing instrument has been served on the following person(s) on July 27, 2019, via the Court's electronic notice and filing system and/or U.S. Mail:

Scott Arnold
The Law Office of Scott Arnold, PC
310 Main Street, Ste. 200
Houston, Texas 77002

Maverick Ray and Matthew Marzak
Maverick Ray and Associates, LLC
310 Main Street, Ste 300
Houston, Texas 77002

*/s/ Tim Flocos*
**TIM FLOCOS**